Joyce MILES, Plaintiff,

v.

**NORTH GENERAL HOSPITAL, Thomas Long, Alan Liebowitz, Pearl John-Stiell, Defendants.**

**No. 96 CIV. 0853(DC).**

United States District Court,
S.D. New York.

March 27, 1998.

Law Office of Donna M. Douglas, by Malik K. Cutlar, New York City, for Plaintiff.

Rosenbluth & Rosenbluth, by Thomas R. Rosenthal, New York City, for Defendants.

## OPINION

CHIN, District Judge.

In this employment discrimination case, plaintiff Joyce Miles claims that she was unlawfully discharged by her former employ-

er, defendant North General Hospital (the "Hospital"), because of her age and national origin. Plaintiff all but concedes that her work performance was deficient. Indeed, nine months before she was fired, she resigned, because, in her words, she was having difficulty "trying to keep up with the current pace." She rescinded her resignation the next day, only to be fired some nine months later.

Defendants move for summary judgment dismissing plaintiff's remaining claims. Although the evidence is thin, I find that one of plaintiff's claims—her age discrimination claim—survives this motion for summary judgment. Indeed, plaintiff was 55 years old at the time she was fired, had worked for the Hospital for some 25 years, and was discharged under circumstances that could reasonably suggest that her age was a factor. For the reasons set forth more fully below, the motion for summary judgment is granted in part and denied in part.

## BACKGROUND

### A. The Facts

#### 1. Employment History and Job Responsibilities

Plaintiff was born on July 18, 1939 and is of Jamaican national origin. (Miles Tr. at 77). She commenced her employment with the Hospital in approximately 1969 and continued working for the Hospital until her employment was terminated on December 16, 1994. (Amended Compl. ¶ 11; Liebowitz Aff. ¶¶ 3–6, Exs. B, C, D; Miles Tr. at 79). Plaintiff was promoted to Clinical Supervisor in 1980, and from approximately 1990 through 1994, plaintiff was a Nursing Care Coordinator (hereinafter "NCC"). (Amended Compl. ¶ 12; Miles Tr. at 14–20).

In 1991, the Hospital relocated to a new building and plaintiff was assigned nursing and oversight responsibilities for the 6th floor, a 40–bed patient unit. (Miles Tr. at 231). From approximately 1993 until December 1994, plaintiff's immediate supervisor was Agnes Belgrave, an Assistant Director of Nursing ("ADN"). (Belgrave Tr. at 9–11). Belgrave is of Barbadian national origin and was born on September 4, 1941. (Belgrave

Tr. at 9). The Director of Nursing from approximately 1990 until 1994 was Pearl John–Stiell. (Defs. 56.1 Statement ¶ 24; Rockhead Aff. ¶ 2). Stiell was born in Aruba on February 7, 1951 and was 43 years old at the time of plaintiff's discharge. (Stiell Tr. at 278). Termination of employment decisions in Nursing had to be discussed with Stiell. (Stiell Tr. at 167–68). Indeed, Stiell made the decision to terminate plaintiff's employment in December 1994. (Stiell Tr. at 8–9).

As an NCC, plaintiff was responsible for patient care, a nursing staff, and the timely submission of various reports and "all the paperwork." (Miles. Tr. at 14–20; Stiell Tr. at 9–11, 54, 56–58, 251–56; Belgrave Tr. at 13–15). More specifically, plaintiff was responsible for the timely submission of Quality Improvement ("Q.I.") Reports, time schedules, monthly unit reports, inservice unit reports, skin care rounds sheets, and safety/risk management reports. (Stiell Tr. at 9–10, 54, 56–58, 251–56; Belgrave Tr. at 13–15). Also in her capacity as an NCC, plaintiff supervised a staff that included different levels of nurses, volunteers, and students. (See Liebowitz Aff., Ex. C).

#### 2. Performance

Beginning in or around 1992, plaintiff started receiving oral and written warnings from her superiors concerning her failure to submit reports and other documentation in a timely fashion. In addition, plaintiff was warned about patient care issues on the floor for which she was responsible as NCC. The failure to submit timely reports and documentation continued in 1993 and 1994 until plaintiff was discharged from her position. Plaintiff was aware of the performance issue and does not deny that she failed to submit her reports in a timely fashion. Plaintiff claims, however, that her colleagues were equally deficient and that she was singled out for adverse treatment. (See generally Liebowitz Aff., Exs. C & D; Miles Tr. at 79–80, 85–90, 255–60, 264, 268–73, 298; Stiell Tr. at 8, 14, 48–49, 56–58, Belgrave Tr. at 35).

Plaintiff's performance appraisals for the years 1991–1994 demonstrate that she did

have performance issues concerning the timely submission of reports, although she otherwise had favorable write-ups. (*See generally* Liebowitz Aff., Ex. C (containing four job evaluations)). The performance appraisals contained both supervisory assessment as well as employee self-assessment.

In plaintiff's "1991 Job Evaluation," her supervisor commented that there was improvement in plaintiff's documentation but that there were "ommissions [sic] at times." In that same evaluation, however, the following comment appeared: "Ms. Miles has been very helpful in preparing Medical Record Committee and Risk Management Committee reports. Very flexible. Follows through with any assignment given ...." Of the 21 elements on which she was evaluated, plaintiff was ranked as having met or exceeded her job requirements for every element. (*Id.*, 1991 Evaluation).

Of the 21 elements on which she was evaluated in 1992, plaintiff was ranked as having exceeded normal expectations and job requirements on 19 elements. On the remaining two elements—responsibility for unit and effective communication/positive hospital image—plaintiff was ranked below meeting the requirements of her position. Stiell noted on plaintiff's 1992 evaluation that plaintiff needed improvement in time management because she did not complete assignments on time. Plaintiff acknowledged in the 1992 evaluation that she needed to submit her reports in a timely manner. (*Id.*, 1992 Evaluation).

Plaintiff's 1993 evaluation was demonstrably less favorable than her prior two evaluations. In this evaluation, she was ranked below meeting the minimum requirements of her position for 14 of the 21 elements. The evaluation contained a number of negative comments such as: (1) "patient care studies are deficient"; (2) "has to be reminded to submit reports"; (3) "documentation is sometimes deficient"; (4) "employee evaluations are still outstanding"; (5) "needs to be consistent in the review of policies and procedures with staff"; (6) "she usually has to be reminded to complete certain tasks"; and (7) "still deficient in submission of reports in a timely manner." (*Id.*, 1993 Job Evaluation).

Ironically, plaintiff's 1994 evaluation—the year she was fired—was, for the most part, favorable. In this evaluation, she was ranked below meeting the minimum requirements of her position for only two of the 21 elements. She was ranked as exceeding expectations in seven of the remaining 19 elements. Again, however, the evaluation contained negative comments about documentation and reports. Comments in this evaluation include: (1) "records of all inservices are not completed in a timely manner"; (2) "needs to improve in processing employees' evaluations in a timely manner"; and (3) "needs to improve the processing of her written assignments in a timely manner." This evaluation was dated July 1994, just five months before plaintiff was fired. (*Id.*, 1994 Job Evaluation).

### 3. *Resignation Leading up to Discharge*

Plaintiff decided to resign from her position at the Hospital and explained her resignation in a letter dated March 24, 1994. The letter was addressed to Stiell and stated that plaintiff's "reason for resigning is that the pace have [sic] increased beyond my limits of cooping [sic] .... Currently things are changing so fast that I have to devote too much time trying to keep up with the current pace." (Liebowitz Aff., Ex. E). The letter also stated that, at times, plaintiff "felt insulted and undermined when subordinates are questioned about me in my absence and incorrect opinions are formed about me." (*Id.*). On March 25, 1994, plaintiff decided to rescind her resignation citing that "under the applicable labor and employment law guidelines, it is my legal right to exercise this option within six days." (*Id.*).

From March 1994 until plaintiff was fired on December 16, 1994, she received approximately eight written warnings concerning late reports as well as problems on her floor with patient care, including one dated December 16, 1994—the day plaintiff was fired. (Liebowitz Aff., Ex. D (twice plaintiff received two written warnings on the same day)). On December 15, 1995, Stiell advised plaintiff that if she did not resign from her position by December 16, 1995, she would be fired. (*Id.*). Apparently, Stiell gave plaintiff

the option of resigning in lieu of termination two weeks prior to the December 15, 1994 letter. (*Id.*).

In fact, prior to being discharged, Alan Liebowitz, Director of the Hospital's Human Resources Department, spoke to plaintiff about resigning. (Liebowitz Tr. at 74–77). Plaintiff claims in addition that Stiell offered her three months' pay or the permission to work for an additional six months before finding a new job if plaintiff would resign. (Miles Tr. at 240–41, 244–45). Plaintiff did not resign and she was fired effective December 16, 1994. (Compl.¶ 13).

### 4. *Statistics*

In response to discovery requests and in support of this motion, defendants compiled information on their nurse managers for the years 1990–1994 regarding age, national origin, and cessation of employment dates. (Liebowitz Aff. ¶¶ 13, 14, 15, 16, Exs. I, J, K).

In her opposition, plaintiff does not admit to the authenticity of the compiled information because it was "produced by one of the named Defendants (an interested party), and Plaintiff has no idea regarding the reliability of the information." (Pl. Mem. at 8 n. 7). Plaintiff, however, does not offer any proof to contradict the compiled information. In addition, defendants represent that all the underlying records upon which the compiled information was based were provided to plaintiff in discovery. (Defs. Opp. at 24 n. 15).

The Court has reviewed the statistical information provided by defendants as well as plaintiff's objection to the authenticity of the information and concludes that no reasonable jury would doubt the veracity of the information even if all reasonable inferences are drawn in favor of plaintiff. Therefore, I

accept the compiled information as accurate. A summary of that information follows.[1]

#### a. *Age*

There were approximately 24 nurse managers who were active at the time of plaintiff's termination from employment. Age information is available for 22 of them and shows that six were under the age of 40(27%); nine were between the ages 40 to 49(41%); and seven were 50 or older (32%). When plaintiff was fired on December 16, 1994, four nurse managers were older than plaintiff and all of these individuals are still employed by the Hospital. The other three nurse managers 50 or older at the time of plaintiff's discharge are also still employed by the Hospital.

Approximately 19 nurse managers resigned, retired, were laid off or were fired during the period from 1990 until plaintiff's discharge from employment. Age information is available on 18 of them and shows that when their employment with the Hospital ceased, four were under the age of 40(22%); seven were between the ages 40 to 49(39%); and eight were 50 or older (44%).[2] Three individuals were fired, whose ages at that time were 42, 44, and 54. One individual resigned in lieu of being fired, who was 38.

Since plaintiff's discharge, two nurse managers have resigned (ages 41 and 33); one was let go due to a reduction-in-force (age 42); and one resigned in lieu of being fired (age 44).

#### b. *National Origin*

National origin information is available for 23 of the approximately 24 nurse managers who were active at the time of plaintiff's termination from employment. Of these 23: eight were from the United States; six were

---

1. Note that the statistics cited by the Court are based on the compiled information itself and not defendants' summary of that information as set forth in their briefs or plaintiff's characterization of it. (*See* Defs. Mem. at 15–17; Pl. Opp. at 8).

2. Counted in this category is former Hospital per diem nurse Aureola Petrus. Defendants did not have age information available on Petrus. She stated in an affidavit, however, that she was a few months shy of 65 when she resigned. (*See*

Pl.Ex. G ¶ 3). Edith Hemmings Williams was also included in this category, although it is not clear from the record when she ceased employment with the Hospital. Defendants say that Williams ceased employment in July 1993 based on a reduction-in-force. In an affidavit, however, Williams claims she was told she had to retire in June 1992. (*See* Pl.Ex. F ¶ 3). In any event, Williams was over the age of 65 when she left the Hospital's employ—be it 1992 or 1993.

from the Philippines; *four were from Jamaica (17%);* two were from Barbados; one was from Trinidad; one was from Costa Rica; and one was either from Trinidad or the United States. All four Jamaican employees active at the time of plaintiff's discharge are still Hospital employees.

National origin information is available on 18 of the approximately 19 nurse managers who resigned, retired, were laid off or were fired during the period from 1990 until plaintiff's discharge from employment. When their employment with the Hospital ceased, eight were from the United States; five were from Jamaica (27%); two were from Trinidad; one was from the Philippines; one was from the Virgin Islands; and one was from the United States or Grenada. Three individuals were fired, one of whom was from the United States and two of whom were from Jamaica. One individual resigned in lieu of being fired, who was from the United States.

Since plaintiff's discharge, two nurse managers have resigned, one from the United States and one from the Philippines; one was let go due to a reduction-in-force who was from Costa Rica; and one resigned in lieu of being fired who was from the United States.

## B. *Procedural Background*

### 1. *Prior Proceedings*

On March 10, 1995, plaintiff filed an administrative complaint of discrimination. (Rosenthal Aff., Ex. 5). On November 30, 1995, the City of New York Commission on Human Rights issued a Notice of Administrative Closure in the case at plaintiff's request. (*Id.*). Two weeks later, the Deputy Commissioner for the Office of Mediation & Conflict Resolution informed the parties that the case was being closed in that office and transferred back to the Law Enforcement Bureau for further investigation and litigation. (Rosenthal Aff., Ex. 6).

In February 1996, plaintiff commenced the instant action. After discovery was complete, the parties agreed in a November 22, 1996 Stipulation and Order, pursuant to Fed. R.Civ.P. 41(a), to the dismissal of the following claims against the defendants: (1) race discrimination; (2) breach of contract; (3) defamation; (4) negligence; (5) retirement pension and ERISA; and (6) intentional infliction of mental distress. The only claims that remain in the case, therefore, are age and national origin discrimination.

This motion followed.

### 2. *Plaintiff's Allegations*

Plaintiff claims she was discriminated against on account of her age (55 at the time of discharge) and her national origin (Jamaican). (Pl. Mem. at 1–2; Amended Compl. ¶¶ 59, 60, 63, 64). She claims defendants violated New York's State and City Human Rights Laws and the Age Discrimination in Employment Act, 29 U.S.C. § 623(a) (the "ADEA"), because "age was a motivating factor and made a difference in the decision to discharge" her. (Amended Compl. ¶ 60). She also claims defendants violated Title VII, 42 U.S.C. § 2000e *et seq.*, because national origin was a motivating factor "that made a difference in the decision to discharge" her. (*Id.* ¶ 64).

Plaintiff claims that the discrimination began in or around the end of 1990 and included: (1) "harassment"; (2) "unfounded criticism of her work performance"; and (3) being "singled-out for disciplinary write-ups." (Pl. Mem. at 2). Furthermore, plaintiff claims that the alleged discriminatory treatment was perpetrated by defendant Stiell and that defendants Liebowitz and Long encouraged, approved, and participated in the treatment. (*Id.; see also* Amended Compl. ¶ 32). Plaintiff argues that defendants' articulated reason for firing her—her performance deficiencies—was pretextual.

## DISCUSSION

### A. *Legal Standards*

#### 1. *Summary Judgment Standard*

The standards governing motions for summary judgment are well-settled. Summary judgment may be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec, Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, *id.* 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Once the moving party meets its initial burden of production, the burden shifts to the nonmoving party to demonstrate that there exist genuine issues of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* 475 U.S. at 586. The nonmoving party may not rest upon mere "conclusory allegations or denials," but must set forth "concrete particulars" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984)). There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249. As the Supreme Court stated in *Anderson*, "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* 477 U.S. at 249–50 (citations omitted).

**2. *Age & National Origin Discrimination***

■ The "ultimate issue" in any discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," *i.e.*, that

there was discriminatory intent. *Fields v. New York State Office of Mental Retardation and Dev. Disabilities*, 115 F.3d 116, 119 (2d Cir.1997); *see St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College*, 114 F.3d 1332, 1336 (2d Cir.1997) (*en banc*), *cert. denied*, —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Plaintiffs have generally sought to meet that burden by using a "mixed-motives" analysis, *see de la Cruz v. New York City Human Resources Admin. Dep't of Social Servs.*, 82 F.3d 16, 23 (2d Cir.1996); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir.), *cert. denied*, 506 U.S. 826, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992), or by proving "pretext" under the three-part test first enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *de la Cruz*, 82 F.3d at 20.

■ As articulated in recent years, the three-step *McDonnell Douglas* test theoretically operates as follows. First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) she is a member of a protected class (2) who was qualified for her position (3) who suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas*, 411 U.S. at 802; *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir.1997). Second, if the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden then "shifts" to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 879 (2d Cir.1997); *Fisher*, 114 F.3d at 1335–36. Third, if the defendant articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's*, 509 U.S. at 510–11. The plaintiff must then show, without the benefit of any presumptions, that it is more likely than not that the employer's decision was motivated at least in part by a discriminatory reason. Be-

cause the defendant has at this point offered a nondiscriminatory reason for its actions, the plaintiff must show that the proffered reason is in reality a pretext for unlawful discrimination. *See Fisher,* 114 F.3d at 1337.

Although the *McDonnell Douglas* framework has been with us for some 25 years, it has proven at times to be confusing and unworkable. For the reasons set forth in my Opinion issued yesterday in *Lapsley v. Columbia University,* 999 F.Supp. 506 (S.D.N.Y.1998), I believe the *McDonnell Douglas* test has outlived its usefulness. It should be discarded and courts instead should focus on the "ultimate issue"—whether the plaintiff has proven that it is more likely than not that the employer's decision was motivated at least in part by an "impermissible," or discriminatory, reason.

[3] In the summary judgment context, a more direct approach would refocus attention on what should be the central inquiry: the evidence, or lack of evidence, of discrimination in a particular case. In considering a summary judgment motion, courts should address the ultimate issue by examining whether the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that a defendant's decisions were motivated at least in part by an impermissible reason. *See Fisher,* 114 F.3d at 1347. The court should conduct this inquiry in the following manner: first, by evaluating plaintiff's proof, direct or otherwise, of discrimination; second, by evaluating defendant's proof that it did not discriminate, including evidence of defendant's explanations for its decisions; and third, by considering the evidence as a whole, resolving all conflicts in the proof and drawing all reasonable inferences in favor of the plaintiff.

█ In considering the ultimate issue, a factfinder at trial or a court considering a motion for summary judgment must bear two concepts in mind. First, the issue is intentional discrimination—the plaintiff has the burden at all times of proving, by a preponderance of the evidence, that she was the victim of intentional discrimination. *See St. Mary's,* 509 U.S. at 507 (stating that the "ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff") (quoting *Burdine,* 450 U.S. at 253). It is not enough that the plaintiff was unfairly treated or that a defendant's stated reasons for its employment actions are proven to be pretextual. Rather, while unfair treatment and a defendant's false statements may constitute "pieces of circumstantial evidence" that support a claim of intentional discrimination, the evidence as a whole must be sufficient to sustain an "ultimate finding" of intentional discrimination. *Fisher,* 114 F.3d at 1338.

█ Second, at the same time, proof of intentional discrimination is often elusive. Because an employer's "intent and state of mind are implicated," *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), "direct, smoking gun, evidence of discrimination" is rarely available. *Richards v. New York City Bd. of Educ.,* 668 F.Supp. 259, 265 (S.D.N.Y.1987), *aff'd,* 842 F.2d 1288 (2d Cir. 1988). Courts must continue to be mindful that "'clever men may easily conceal their motivations.'" *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1043 (2d Cir.1979) (quoting *United States v. City of Black Jack,* 508 F.2d 1179, 1185 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975)); *accord Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989); *see also Tyler,* 958 F.2d at 1187 ("[If] there is at the very least a thick cloud of smoke," an employer must "convince the factfinder that, despite the smoke, there is no fire") (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 266, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)). All a plaintiff need do is persuade a finder of fact, from all the evidence in the record, that it is more likely than not that the adverse employment decision was motivated at least in part by an impermissible reason.

**B.** *Application to Discrimination Claims*

As the parties rely on the *McDonnell Douglas* test and it remains governing law, I am bound to apply it. Rather than do so formalistically, however, I assume that plaintiff has made out a prima facie case. Defen-

dants have articulated legitimate, nondiscriminatory reasons for their actions. Hence, I proceed directly to the ultimate question: whether plaintiff has presented sufficient evidence from which a reasonable jury could find age and/or national origin discrimination. I do so by reviewing first plaintiff's evidence, then defendants' evidence, and finally the record as a whole.

### 1. Plaintiff's Evidence

Plaintiff points to the following evidence that she alleges proves that she was dismissed because of her age: (a) her dismissal; (b) discriminatory remarks made by Stiell about her age in 1991 and 1992; (c) a comment by Stiell that she would pad plaintiff's personnel file with adverse documentation; (d) a purported "pattern" of harassment and coercion to force older employees to resign or retire from their jobs; (e) purported disproportionate treatment; and (f) Stiell's abrasiveness.

Plaintiff does not allege that defendants made a single comment to her concerning national origin. She points to the fact that two Jamaican nurse managers were fired in 1991 as evidence of national origin discrimination. In addition, she alleges a purported "pattern" of discrimination against Jamaican employees as evidence to support her claim.

I review the items of evidence in turn.

### a. The Dismissal

Plaintiff was discharged when she was 55 years old and had been employed by the Hospital for some 25 years. Although this evidence could not, by any means, sustain a verdict in favor of plaintiff, it does provide some support for her claim of age discrimination.

### b. Age-Based Discriminatory Remarks

For purposes of this motion, I accept as true plaintiff's allegations about the age-based comments Stiell made to her. Sometime after the move, in early 1992, Stiell told plaintiff that when she restructured she "would need younger people to cope on the floor because what she [was] going to be requiring ... [would require one] to be younger to be able to cope with it." (Miles Tr. at 74). Also at the same time in early 1992, Stiell told defendant that she was "too old" to be on a unit and suggested that she put in for a staffing position instead. In addition, in July 1992 while taking around a new employee, Sharon Handy, Stiell said, "you wouldn't ... believe how old Miles" is. (Miles Tr. at 133).[3] See Sweat v. Miller Brewing Co., 708 F.2d 655, 656–57 (11th Cir. 1983) (evidence of stereotypical statements about women and older people generally raise issue of fact as to intent of employer's action).

### c. Padding the Personnel File

Stiell told plaintiff in 1994 that if she did not resign, Stiell would fill her personnel file with adverse documentation. Plaintiff suggests in her opposition that the "too old" comment was coupled with this comment. In fact, that is not what plaintiff testified to in her deposition. (Miles Tr. at 153–58). She testified that this comment was made sometime after she rescinded her resignation in 1994.

I assume, as I must for purposes of this motion, that the comment was made. That being the case, the eight warnings written by Stiell from March 1994 until plaintiff's discharge lose much of their impact. In addition, the fact that Stiell was so intent on padding plaintiff's file (assuming she was) is evidence of some animus toward plaintiff.

### d. "Pattern" of Forcing Older Employees Out

In addition to her own, albeit conclusory, allegation that Stiell engaged in a pattern of harassing behavior aimed at forcing older employees to resign or retire, plaintiff relies on affidavits of three former employees (all over the age of 40 when their employment with the Hospital ceased) to support this allegation—Rita Walker, Merle Walker, and Aureola Petrus. Rita Walker stated in her

---

**3.** In her deposition, plaintiff could not remember precisely when this comment was made but guessed it was made in 1993. In fact, Handy starting working for the Hospital in July 1992. (See Handy Tr. at 34).

affidavit that when she worked at the Hospital, she heard that it "was getting rid of the older nursing staff to bring in new staff" because the older staff was too set in their ways and not amenable to change. (R. Walker Aff. ¶ 11). Rita Walker also said that it "seemed like a large number of the older nursing staff were forced out." (Id.). Merle Walker stated that, based on her experience and observation, "the Hospital had a pattern of getting rid of its older employees." (M. Walker Aff. ¶ 10). Merle Walker also claimed that after she was fired, that her personnel file was "padded with disciplinary write-ups that were not present at the time [she] was terminated." (M. Walker Aff. ¶ 15). Aureola Petrus stated that she "noticed a pattern of older employees leaving the Hospital" during her last few years there, and that she noticed the pattern in terms of Stiell, who "just did not want the old-timers there." (Petrus Aff. ¶¶ 13, 14, 15). See Hunter v. Allis–Chalmers Corp., 797 F.2d 1417, 1423 (7th Cir.1986) (evidence of harassment against black workers other than plaintiff was admissible to show that defendant "condoned racial harassment by its workers and [to] rebut[] [defendant's] defense that it had fired [plaintiff] for cause").

#### e. Disproportionate Treatment

Plaintiff alleges that she was treated more harshly than other employees, and contends that this disproportionate treatment is evidence of discrimination. Although she concedes that she was late submitting reports and other documentation, plaintiff claims that other NCCs were also deficient in this regard. She was fired. Yet, as Stiell admitted in her deposition, no other NCC has ever been fired for submitting late reports.

A reasonable jury could also conclude that termination of a 25–year career was unreasonably and inexplicably harsh. See Lewis v. Sears, Roebuck & Co., 845 F.2d 624, 633 (6th Cir.1988) (employer's decision to fire plaintiff "may have been so unusual or idiosyncratic as to shed light upon [its] motivation in firing her"); Bentley v. Stromberg–Carlson Corp.,

638 F.2d 9, 11 (2d Cir.1981) (employee's "extensive and meritorious record" with an employer could suggest that his discharge was motivated by improper considerations of age). Although plaintiff's performance evaluations suggest that she was performing at or above the requirements of her position in most areas,[4] defendants fired her for a problem shared by many other employees. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, ·282–83, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) (pretext may be established by proof plaintiff punished by the employer more severely than others for similar infractions or deficiencies). Moreover, a jury could reasonably conclude that defendants' failure to opt for less drastic discipline—including demotion—evidenced a discriminatory intent.

#### f. Stiell's Abrasiveness

The record also contains evidence that Stiell was openly hostile to plaintiff. Several affidavits submitted by plaintiff attest to this hostility. For instance, Rita Walker claimed that all staff members were under pressure, but that plaintiff's pressure was worse because of Stiell's "constant harassment of her." (M. Walker Aff. ¶ 6). Rita Walker went so far as to say that Stiell "had it in for Ms. Miles," and was "vicious and Nazi-like in her approach to Ms. Miles. Mrs. Stiell singled out, and was super hard on Miles." (Id. ¶ 10). Edith Hemmings stated that she was "aware that other nurse care coordinators were also sometimes late in handing in their reports." (Hemmings Aff. ¶ 7). Finally, Aureola Petrus stated that "[i]n all my time working at the Hospital, I had never heard of anyone being fired for late reports." (Petrus Aff. ¶ 9).

#### g. Discrimination Against Jamaicans

As previously noted, plaintiff does not allege a single remark or comment regarding national origin discrimination. She points to the fact that two Jamaican employees—Juliet Rockhead and Merle Walker—were fired in

---

4. There is some evidence in the record of problems with patient care. Indeed, she received some warnings/reprimands in this regard. Plaintiff claims the warnings were fabricated. In any event, Stiell admitted in her deposition that plaintiff was fired for failing to submit reports and documentation, not for any other performance deficiency.

1991 as proof of national origin discrimination. (*See* Pl. Mem. at 2–3; Miles Tr. at 133; Rockhead Aff. ¶¶ 7, 8). As for the "pattern" of discrimination against Jamaicans, plaintiff offers no proof except for her own conclusory allegations and those of Ms. Rockhead. (*See* Rockhead Aff. ¶ 8) ("During my many years of working for [the Hospital], I observed that Ms. Stiell treated Jamaican workers in the nursing department in a very rude and unfair manner.").

In short, plaintiff has presented substantial evidence to support her claim of age discrimination and some, albeit slight, evidence to support her claim of national origin discrimination.

### 2. *Defendants' Evidence*

Defendants present substantial evidence to show that its decisions were not motivated by any impermissible reasons. I review first the evidence rebutting the age discrimination claim and then the evidence rebutting the national origin discrimination claim.

#### a. *Age Discrimination Evidence*

Defendants maintain that even if all reasonable inferences are drawn in favor of plaintiff, no reasonable jury could conclude that plaintiff's discharge was the result of age discrimination.

First, defendants present substantial evidence to support its contention that it fired plaintiff in December 1994 because she failed to submit documentation and reports in a timely fashion—reports and documentation required of all NCCs. Plaintiff's resignation is a powerful piece of evidence for defendants in this respect. At the same time, however, plaintiff has presented some evidence that seeks to explain her actions in submitting the resignation. (Miles Tr. at 189–95).

Second, defendants point out that plaintiff does not allege that defendants made any age-related comments to plaintiff after June 1992, and therefore they contend that the comments, even assuming they were made, were merely "stray remarks" that do not evidence discriminatory animus. (Miles Tr. 73–74, 102–03, 133, 135–39, 151–52, 332, 230–33, 362–63). Indeed, even though Stiell said that plaintiff was "too old" to handle her own unit, it is undisputed that plaintiff continued to be in charge of her own unit for the next two years until she was discharged. In addition, it is undisputed that at approximately the same time this comment was made, two other nurse managers who were both over the age of 50 (Agnes Belgrave and Doris Barnes) were placed in charge of patient units. (Miles Tr. 139, 226). I cannot conclude at this juncture, however, that the comments are so remote that they would be inadmissible at trial. Indeed, in view of the other evidence in the case, it would probably be more appropriate to let the jury decide what, if any weight, to give to the comments.

Third, defendants contend that the record shows that plaintiff was not singled out for disciplinary treatment. They point out that other employees were also warned about late reports (*see* Liebowitz Aff., Ex. F), but that plaintiff's deficiencies in this regard were simply more egregious. (*See* Miles Tr. at 79, 104, 112, 255–60, 268–73, 374; Belgrave Tr. at 23, 35; Stiell Tr. at 8–12, 24–29, 56–58; Liebowitz Aff, Exs. C, D, F). These performance deficiencies, according to defendants, prompted Stiell to fire plaintiff. (Stiell Tr. at 14, 48–49, 56–58; Miles Tr. at 78–80, 85–86, 104; Liebowitz Aff., Ex. D). In view of the generally favorable nature of plaintiff's evaluations, however, and all the circumstances of the case, an issue of fact exists as to whether plaintiff's deficiencies were more egregious than the deficiencies of other NCCs.

Finally, defendants rely on the statistics, contending that the statistics prove that the Hospital employed individuals over the age of 40 in nurse manager positions in greater numbers than those under the age of 40. While it is true that the overwhelming majority of the Hospital's nurse managers from 1990 to 1994 were over the age of 40, and that the Hospital continued to hire more individuals over the age of 40, the statistics are largely inconclusive. Indeed, they arguably show that a disproportionate number of older employees resigned, retired, or were fired from 1990–1994 relative to employees younger than 40. (*See* Liebowitz Aff., Exs. I, J, K).

### b.  *National Origin Discrimination*

Defendants point out that plaintiff's only evidence in support of this claim is that they fired Juliet Rockhead and Merle Walker—both Jamaican—in *1991*, three years before plaintiff was fired. Plaintiff alleges in conclusory fashion that these individuals were fired in an unlawfully discriminatory manner, but provides no evidence to prove it. Indeed, in her deposition, plaintiff admitted that she has no knowledge concerning the circumstances of either woman's discharge from employment. (Miles Tr. at 64). Moreover, plaintiff *herself* replaced Rockhead after she was fired. (Miles Tr. at 69).

Defendants also argue that the statistical information regarding national origin contradicts plaintiff's claim. At the time of her discharge, there were four active Jamaican nurse managers who were (and still are) employed by the Hospital. Thirteen of the 18 nurse managers whose employment with the Hospital ceased from 1990–1994 were *not* Jamaican. Even though two Jamaicans were fired from 1990 to 1994, an individual from the United States was also fired. Another individual from the United States resigned in lieu of being fired. These statistics, defendants contend, show that Jamaican employees were not treated any differently from employees of other national origins.

### 3.  *The Record as a Whole*

Considering the evidence as a whole, resolving all conflicts in the evidence and drawing all reasonable inferences in plaintiff's favor, I conclude that a reasonable jury could find that plaintiff was dismissed, at least in part, because of her age. I also conclude, however, that no reasonable jury could find that plaintiff's national origin played any role in her dismissal.

### a.  *Age Discrimination*

■ Notwithstanding defendant's strong evidence that it did not discriminate on any basis, plaintiff has presented sufficient evidence from which a rational jury could conclude that her discharge was based at least in part on her age. That evidence includes: the discriminatory remarks; the affidavits of the three former employees; Stiell's purported harsh treatment of plaintiff; Stiell's effort to pad plaintiff's file with negative references to her performance; and the Hospital's seemingly severe decision to fire, rather than demote or discipline in some other less severe fashion, a 55–year old employee with 25 years of service who was receiving satisfactory or better ratings in most categories on her evaluations, when other NCCs who were also remiss in submitting reports on time were not fired. A jury could reasonably conclude, on the basis of this evidence, that, more likely than not, plaintiff was dismissed at least in part because of her age.

Finally, while *St. Mary's* and *Fisher* make it clear that a plaintiff must show not only that a defendant's articulated reasons are pretextual but that they are a pretext for discrimination, here a jury could find, on the basis of Stiell's alleged comments and all the circumstances of the case, that the pretext was intended to mask her desire to fire plaintiff because Stiell believed she was too old to do her job well.

Accordingly, defendants' motion for summary judgment on plaintiff's age discrimination claim is hereby denied.

### b.  *National Origin Discrimination*

■ Plaintiff's only evidence of national origin discrimination is that two Jamaican employees were fired *three* years prior to her own discharge. There are no discriminatory comments or any other concrete evidence in the record, however, to support the national origin discrimination claim. Indeed, plaintiff herself replaced one of the Jamaican employees who was fired. Moreover, the statistical evidence, while not dispositive by itself, undercuts any claim of a "pattern" of discrimination against Jamaican employees. In short, no reasonable factfinder could conclude based on plaintiff's conclusory allegations and bare evidence that she was discriminated against because of her national origin.

Accordingly, plaintiff's national origin discrimination claim is hereby dismissed with prejudice.

## C. Defendants' Other Defenses

In addition to arguing that plaintiff failed to meet her burden of proving pretext for her discrimination claims, defendants raise three other issues that I must address. First, defendants argue that certain of plaintiff's allegations are time-barred. Second, defendants argue that plaintiff cannot proceed with her claims because of her election of remedies. Finally, defendants argue that Stiell, Long, and Liebowitz cannot be held individually liable for their alleged misconduct. I address each argument in turn.

### 1. Time Limitations

■ Defendants argue that plaintiff's allegations of discriminatory events occurring prior to May 15, 1994 are not actionable under ADEA or Title VII.[5] They also argue that plaintiff's allegations of discriminatory events occurring prior to February 5, 1993 are not actionable under state or city anti-discrimination provisions. (*See generally* Defs. Mem. at 36–37). Even if the statute of limitations has expired for the purpose of bringing suit on particular claims, proof of the conduct forming the basis for those claims may nonetheless be admissible as evidence of a discriminatory environment or as circumstantial evidence that the conduct alleged in the current suit has occurred. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). Hence, I need not reach this issue at this time, as the events pre-dating plaintiff's discharge may be admissible even if they are not a basis for liability.

### 2. Election of Remedies

Defendants also argue that plaintiff's age discrimination claim under New York state and city anti-discrimination provisions is not actionable because of the election of remedies provision in § 297(7) of the New York Executive Law and § 8–502 of the New York City Administrative Code. (Defs. Mem. at 33 n. 18).

■ Defendants' argument is rejected because the November 30, 1995 letter from the City Commission on Human Rights is dispositive on this issue. (Rosenthal Aff., Ex. 5). In that letter, the commission notified plaintiff that her complaint was "closed for administrative convenience." (*Id.*). That being the case, plaintiff was no longer precluded from filing suit by the election of remedies doctrine, as state law permits a plaintiff to file suit after the issuance of a dismissal for administrative convenience. N.Y. Executive Law § 297(9) (McKinney Supp.1997–98). To the extent defendants rely on the December 14, 1995 letter from the Commission's Office of Mediation & Conflict Resolution (Rosenthal Aff., Ex. 6), that reliance is misplaced, because the letter did not open or reinstate plaintiff's case. Indeed, the case apparently was never reinstated. Thus, plaintiff's state and city law claims are not barred by the election of remedies doctrine.

### 3. Individual Liability

■ Defendants correctly argue that individual defendants Stiell, Long, and Liebowitz cannot be held personally liable under Title VII or the ADEA. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995); *Storr v. Anderson School*, 919 F.Supp. 144, 148 (S.D.N.Y.1996). Under New York law, however, the individual defendants may be sued in their personal capacities for discriminating on the basis of age or sex. *Tomka*, 66 F.3d at 1316–17. In *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 483 N.Y.S.2d 659, 473 N.E.2d 11 (Ct.App.1984), the New York Court of Appeals held that an employee is not individually subject to suit under New York's Human Rights Law "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." 483 N.Y.S.2d at 660, 473 N.E.2d 11. The *Tomka* court added that a defendant who "actually participates in the conduct giving rise to a discrimination claim may be held personally liable." *Tomka*, 66 F.3d at 1317.

---

**5.** The Title VII argument is irrelevant as I am dismissing plaintiff's national origin discrimination claim with prejudice.

In light of these holdings, defendant Long clearly cannot be personally liable even if plaintiff prevails on her age discrimination claim at trial. There is no evidence that defendant Long had any involvement whatsoever in the personnel decisions that led to this case. There is a question of fact, however, as to Liebowitz's involvement given his contact with plaintiff prior to her discharge. As to defendant Stiell, there is no doubt that she can be held personally liable for the alleged misconduct in this case—if plaintiff prevails.

Accordingly, the claims against defendant Long are dismissed with prejudice. To the extent defendants move for summary judgment dismissing the claims against Liebowitz and Stiell, the motion is granted as to the national origin claims and the ADEA claim, and is denied as to the age claim under state and city law.

### CONCLUSION

Defendants' motion for summary judgment is denied in part and granted in part. The national origin claims are dismissed in all respects as to all defendants. The ADEA claim is dismissed as to the three individual defendants. The age discrimination claim under state and city law is dismissed as to Long. Plaintiff may proceed with her ADEA claim against the Hospital and with her state and city age discrimination claims against the Hospital, Liebowitz, and Stiell.

The parties shall appear for a pretrial conference on April 24, 1998 at 11:30 a.m.

SO ORDERED.