NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2022 VT 24

No. 2021-176

| | |
|---|---|
| Angela M. Gates | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Bennington Unit, |
| | Civil Division |
| | |
| Mack Molding Company, Inc. | January Term, 2022 |

John W. Valente, J.

Richard T. Cassidy of Rich Cassidy Law, South Burlington, and Siobhan M. McCloskey
 of The Law Office of Siobhan M. McCloskey, PLLC, White River Junction, for
 Plaintiff-Appellant.

Timothy E. Copeland, Jr. and F. David Harlow of Downs Rachlin Martin PLLC, Brattleboro, for
 Defendant-Appellee.


PRESENT:  Reiber, C.J., Eaton, Carroll and Cohen, JJ., and Manley, Supr. J. (Ret.),
        Specially Assigned

¶ 1.     **COHEN, J.**  Plaintiff appeals the trial court's decision granting summary judgment to defendant, her former employer, on plaintiff's claims for disability discrimination under the Vermont Fair Employment Practices Act (FEPA) and retaliation under both the Vermont Parental Family Leave Act (PFLA) and Vermont's workers' compensation law.  We affirm.

¶ 2.     The record below reveals the following material facts.  Defendant hired plaintiff as a "molder" in 1996.  In May 2015, plaintiff reported to defendant that she injured her left knee outside of work.  She subsequently took approximately twelve weeks of leave under the federal Family and Medical Leave Act (FMLA) and the PFLA, which ran concurrently.

¶ 3.    Plaintiff returned to work full-time as a molder in August 2015 after exhausting her FMLA/PFLA leave.[1]   Upon her return, plaintiff handed a note from her medical provider, Dr. Gammons, to the human resources manager.  The note stated that plaintiff could return to work full-time. It stated further that plaintiff could lift and carry twenty-one to fifty pounds "frequently." The note defined "frequently" as constituting "34%–66% of a workday" and "continuously" as being "67%–100%" of a workday.  Plaintiff did not say anything to the human resources manager when she delivered this doctor's note.   She did not make any explicit request for any accommodation to anyone at work.

¶ 4.    Duties of the molder position included operating a machine called the Press 30. Operating this machine required lifting totes weighing thirty-three to thirty-five pounds onto pallets every four-and-a-half minutes.  Plaintiff operated the Press 30 machine when she returned to work as a molder in August 2015.

¶ 5.    Plaintiff left work around one hour into her third shift back in August 2015, due to pain in her left knee.  She did not return to work until October 2015.  During this period, she received short-term disability benefits, which were unrelated to FMLA or PFLA leave.

¶ 6.    When she returned in October 2015, plaintiff provided defendant with a medical note from an orthopedist, Dr. Giering.  This note indicated that plaintiff could work for four hours per day without restriction.  Defendant assigned plaintiff to work as a "finisher" four hours per day.  In the finisher position, plaintiff performed many tasks including operating various molds and machines, sweeping, mopping, and trimming rings.  The essential functions of the finisher position required standing, lifting, squatting, and twisting.   Plaintiff worked part-time as a finisher—four hours per day—during October and November of 2015.  Dr. Giering cleared

---

[1]  Although plaintiff asserted below that she took only 11.9 weeks of leave and therefore did not exhaust her leave in August 2015, she does not address that discrepancy on appeal and it is not relevant to her claims.

2

plaintiff for full-time, unrestricted work in November 2015, at which point she began full-time as a finisher.

¶ 7.    Plaintiff continued to work full-time in the finisher position until May 5, 2016, when she left mid-shift due to knee pain.  That same day, plaintiff met with a different medical provider, Dr. Dwyer.  In a medical note, Dr. Dwyer opined that plaintiff could "return to light duty immediately with the following restrictions: No prolonged standing, lifting, squatting, or twisting."  Plaintiff admitted that these restrictions prevented her from performing the essential functions of the finisher position.  On the morning of May 6, 2016, plaintiff returned to work and delivered Dr. Dwyer's note to her manager, Kevin Peets.  Plaintiff testified that when she presented this note, manager Peets said, "We don't have anything for you."  Plaintiff responded by asking if she could solely trim rings, which was a light-duty task.  Manager Peets declined.  Plaintiff then punched out and went home.  Neither plaintiff nor her doctor provided any indication of when her medical restrictions would end.

¶ 8.    Defendant sent plaintiff a letter dated May 11, 2016, informing her that she had exhausted her FMLA and PFLA leave, and that she had not completed any paperwork to apply for short-term disability or workers' compensation benefits.  The letter noted that an employee had previously communicated with plaintiff on May 9, 2016 and requested that plaintiff complete this paperwork.  The letter further advised that defendant would consider plaintiff's absence to be a "voluntary resignation" and terminate her employment if she did not respond by May 16, 2016.

¶ 9.    On May 12, 2016, plaintiff completed an incident report to apply for workers' compensation, asserting she was injured at work in August 2015 when she first returned from her medical leave and was operating the Press 30 machine.  Apart from going to defendant's offices to fill out this paperwork, between May 6 and May 16, 2016, plaintiff did not return to work, indicate any recovery timeline, or attempt to demonstrate her ability to perform the essential functions of her position.

¶ 10.   Defendant sent plaintiff a final letter, dated May 20, 2016, stating that her application for workers' compensation would be reviewed by its insurance company, but that "[d]ue to production schedules it has become necessary to assign another employee to your position at Mack Molding Company and therefore, your employment has been terminated effective Friday, May 20, 2016."  This letter also requested that plaintiff update defendant regarding her recovery and any interest in reinstatement with defendant.  Plaintiff never informed defendant of her recovery timeline or any interest in future employment.  Plaintiff testified that she did not recover sufficiently to be able to perform the essential functions of her prior finisher position until May 2017.

¶ 11.   Plaintiff filed this lawsuit against defendant later in 2017.  She initially asserted many claims—including several varieties of discrimination and retaliation, as well as other statutory and common law claims—but she withdrew most of them before summary judgment. The remaining claims consisted of two temporally distinct allegations of retaliation under the PFLA; two separate allegations of failure to reasonably accommodate her disability under the FEPA; and one allegation of retaliation for filing a workers' compensation claim—all described as follows.  Plaintiff alleged that defendant violated the FEPA by failing to reasonably accommodate her when she first returned from her knee injury in August 2015 because it assigned her to work on the Press 30 machine, which exceeded her prescribed medical limitations.  She also alleged defendant retaliated against her following her return from PFLA leave in August 2015 by assigning her to the role of finisher in October 2015, instead of reinstating her as a molder. Plaintiff's three other allegations all stemmed from events in May 2016.  She claimed defendant terminated her employment in May 2016 in retaliation for having taken four hours of PFLA leave and having applied for workers' compensation benefits earlier that month.  She also alleged that defendant failed to reasonably accommodate her under the FEPA by not reassigning her to a light-duty position in May 2016.

4

¶ 12.    Following discovery, defendant moved for summary judgment on all of these claims.  The trial court granted the motion in full.[2]  The court concluded that plaintiff failed to establish a prima facie case as to her two allegations of FEPA discrimination and her claim of PFLA retaliation in October 2015.  It determined that she made out prima facie cases of retaliation for filing a workers' compensation claim and taking PFLA leave in May 2016, but that defendant proffered legitimate, nondiscriminatory reasons for terminating her employment, and plaintiff failed to demonstrate a triable issue of fact that these reasons were a pretext for discrimination.  On appeal, plaintiff challenges the trial court's grant of summary judgment as to all but one claim: PFLA retaliation in October 2015.

## Standard of Review

¶ 13.    This Court reviews summary-judgment decisions de novo, using the same standard as the trial court.  Gauthier v. Keurig Green Mountain, Inc., 2015 VT 108, ¶ 14, 200 Vt. 125, 129 A.3d 108.  "Summary judgment will be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' "  Id. (quoting V.R.C.P. 56(a)).  In determining the existence of genuine issues of material fact, courts

---

[2]  For reasons that we need not address in this appeal, the summary-judgment process unfolded piecemeal.  The parties' factual and legal presentations spanned numerous filings across multiple years, such that many key arguments and exhibits were raised for the first time in reply or surreply briefs and various supplemental proffers.  Even after the trial court's initial summary judgment decision, plaintiff filed a motion for reconsideration with additional legal argument, which resulted in a lengthy decision on reconsideration that was effectively part two of the summary-judgment order.  Defendant devotes much of its brief to explaining how and why many of plaintiff's arguments and evidentiary materials were untimely or otherwise improper for consideration on appeal.  Plaintiff does not make a similar argument or contend that she had insufficient opportunity to respond to any of defendant's presentation.  Because the trial court entertained most, if not all, of plaintiff's summary-judgment arguments and exhibits regardless of their timeliness, we too will consider them unless otherwise noted in this decision.  See V.R.C.P. 56(c)(5) ("The court need consider only the materials cited in the required statements of fact, but it may consider other materials in the record.").  Given the fragmented nature of the record below, for clarity we will generally treat the trial court's orders on summary judgment and reconsideration together as a unified decision, and not distinguish among the parties' arguments based on when they were made.

must "accept as true the allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material." Robertson v. Mylan Lab'ys, Inc., 2004 VT 15, ¶ 15, 176 Vt. 356, 848 A.2d 310. "The nonmoving party receives the benefit of all reasonable doubts and inferences." Pettersen v. Monaghan Safar Ducham PLLC, 2021 VT 16, ¶ 9, __ Vt. __, 256 A.3d 604 (quotation and alteration omitted).

¶ 14.   To survive a defendant's motion for summary judgment, the plaintiff must respond with specific facts to raise a triable issue and demonstrate sufficient admissible evidence to support a prima facie case. Dulude v. Fletcher Allen Health Care, Inc., 174 Vt. 74, 79, 807 A.2d 390, 395 (2002).  An issue of fact is material only if it could affect the outcome of the case. O'Brien v. Synnott, 2013 VT 33, ¶ 9, 193 Vt. 546, 72 A.3d 331.  A defendant will prevail on summary judgment if they demonstrate that they are entitled to judgment as a matter of law on at least one legally sufficient defense which bars plaintiff's claims. Allstate Ins. Co. v. Vose, 2004 VT 121, ¶ 13, 177 Vt. 412, 869 A.2d 97.

## I.  FEPA Disability Discrimination

¶ 15.   Plaintiff argues the trial court erred in granting summary judgment to defendant on her two allegations of disability discrimination: August 2015 and May 2016.  We agree with the trial court that plaintiff failed to make a prima facie showing of disability discrimination for either allegation.

¶ 16.   To prevail on a claim of disability discrimination under the FEPA, plaintiff must establish she was a "qualified individual with a disability" and that she was discharged because of her disability. State v. G.S. Blodgett Co., 163 Vt. 175, 180, 656 A.2d 984, 988 (1995); 21 V.S.A. § 495(a)(1) (prohibiting employers from discriminating "against a qualified individual with a disability").  The FEPA defines a "[q]ualified individual with a disability" as a person "with a disability who is capable of performing the essential functions of the job . . . with reasonable accommodation to the disability."  21 V.S.A. § 495d(6).  The disability-discrimination provisions

6

under the FEPA are patterned after the federal Rehabilitation Act, which in turn incorporates standards from the federal Americans with Disabilities Act (ADA), so we look to federal case law to guide our interpretation, the allocations of burdens, and standards of proof. G.S. Blodgett, 163 Vt. at 180, 656 A.2d at 988; see 29 U.S.C. § 794(d) (incorporating ADA standards into Rehabilitation Act). Thus, plaintiff can establish a prima facie case by showing that (1) she was an individual who has a disability within the meaning of the statute; (2) defendant had notice of her disability; (3) with reasonable accommodations, she could have performed the essential functions of the position; and (4) defendant refused to make such accommodations. Stone v. City of Mount Vernon, 118 F.3d 92, 96-97 (2d Cir. 1997) (describing prima facie case of discrimination under Rehabilitation Act and ADA). Once plaintiff makes out a prima facie case, the burden shifts to the employer to show that any reasonable accommodation would have been impossible, would have substantially altered the nature of the job, or would have been unduly burdensome. G.S. Blodgett, 163 Vt. at 181-82, 656 A.2d at 989.

## A. August 2015

¶ 17.   Plaintiff alleged that defendant failed to reasonably accommodate her disability in violation of the FEPA when she initially returned to work after medical leave in August 2015 because defendant reinstated her as a molder, even though defendant knew that this job required physical tasks exceeding her limitations. The trial court rejected her August 2015 claim, finding that the undisputed facts showed that plaintiff failed to request a reasonable accommodation and that no need for accommodation was apparent from the circumstances of plaintiff's return to work. Plaintiff contends the trial court erred because a reasonable jury could have inferred that defendant was on notice that some accommodation was necessary.

¶ 18.   Notice is an indispensable element of a plaintiff's prima facie disability-discrimination claim. "Generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." Brady v. Wal-Mart Stores, Inc., 531 F.3d

7

127, 135 (2d Cir. 2008) (quotation, alteration, and emphasis omitted). We do "not require any formal mechanism or magic words to notify an employer" that an accommodation is needed. Colwell v. Rite Aid Corp., 602 F.3d 495, 506-07 (3d Cir. 2010) (quotation omitted). However, "[t]he employer must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to cause a reasonable employer to make appropriate inquiries about the possible need for an accommodation." Id. (quotations omitted). The duty to provide a reasonable accommodation is also triggered when an employer has independent knowledge of an employee's disability, or when the disability is obvious and the potential need for an accommodation is apparent. Brady, 531 F.3d at 135.

¶ 19. To be clear, it is not enough that the employer merely knows that a plaintiff is disabled. The duty to provide a reasonable accommodation applies to the limitations caused by the disability, not the disability itself. See Gammage v. W. Jasper Sch. Bd. of Educ., 179 F.3d 952, 955 (5th Cir. 1999) ("[T]he ADA does not require an employer to assume that an employee with a disability suffers from a limitation; as a result, it is incumbent upon the ADA plaintiff to assert not only a disability, but also any limitation resulting therefrom."); see also Adams v. Rice, 531 F.3d 936, 944 (D.C. Cir. 2008) ("[W]hen an employee seeks a workplace accommodation, the accommodation must be related to the limitation that rendered the person disabled." (quotation omitted)). Thus, if a plaintiff's summary-judgment proffer fails to establish at least an inference that her employer knew or should have known that she needed a reasonable accommodation, she cannot make out a prima facie case and the employer is entitled to summary judgment.

¶ 20. Here, the undisputed facts show that plaintiff notified defendant of her knee injury upon returning to work in August 2015 by presenting a doctor's note to her human resources manager with no further explanation or request for accommodation. Plaintiff contends that defendant knew this job included physical requirements exceeding her prescribed limitations,

8

namely, operating a Press 30 machine that required lifting between thirty-three and thirty-five pounds "continuously" despite a medical restriction that she lift such weights only "frequently."

¶ 21.    Her argument is not supported by the record. The doctor's note stated that plaintiff could lift and carry twenty-one to fifty pounds "frequently." The note defined "frequently" as constituting "34%–66% of a workday" and "continuously" as being "67%–100%" of a workday. Although plaintiff characterized the Press 30 machine as requiring an ability to lift thirty-three to thirty-five pounds "continuously," she cited exhibits and an affidavit which demonstrate that operating this machine demanded lifting totes weighing thirty-three to thirty-five pounds onto pallets every four-and-a-half minutes during an eight-hour shift, if an employee operates this machine throughout their entire shift. See Robertson, 2004 VT 15, ¶ 15 ("[W]e will accept as true the allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material.").

¶ 22.    Plaintiff argues there was no evidence indicating how long she was required to hold each tote when she loaded it onto a pallet, and she is entitled to the inference that she lifted these totes for such duration and with such frequency as to constitute continuous lifting. Such an inference is not reasonable. See id. ("[T]he nonmoving party receives the benefit of all reasonable doubts and inferences." (emphasis added)). Even assuming molders sometimes had to operate the Press 30 machine for most or all of a shift—a fact that plaintiff did not establish—to find that plaintiff was lifting these totes for at least 67% of her workday, a jury would need to speculate that when she lifted each tote at four-and-a-half-minute intervals she then had to hold or carry that tote for multiple minutes before loading it onto a pallet. Nothing in the evidence suggested that pallets were located a great distance away from the machine or that any other circumstances necessitated holding totes for an extended period of time.

¶ 23.    Neither the molder job description nor any evidence cited by plaintiff suggested that the molder position demanded physical tasks beyond the restrictions stated in plaintiff's

9

doctor's note. Accordingly, defendant was not on notice that plaintiff might need any accommodation for the molder position, and defendant was entitled to summary judgment on plaintiff's FEPA claim for August 2015.

B. May 2016

¶ 24. Plaintiff also asserts that she created a triable issue of fact as to whether defendant failed to reasonably accommodate her when it did not assign her to a light-duty position after she returned from medical leave with prescribed limitations in May 2016. It was undisputed that plaintiff could not perform the essential functions of the finisher position when she returned to work in 2016, and that she requested that defendant accommodate her by assigning her to "trim rings," a light-duty task. It was also undisputed that plaintiff could have, consistent with her medical limitations in May 2016, performed light-duty tasks such as trimming rings. Plaintiff argues that defendant had an obligation to accommodate her by assigning her to an existing, vacant light-duty position. She challenges the trial court's conclusion that she did not present admissible evidence that such a position existed at the time she requested reassignment and therefore failed to establish a prima facie case.

¶ 25. Federal disability-discrimination cases establish that reassignment to an existing, vacant position may be a reasonable accommodation. This case law is based on the definition of "reasonable accommodation" under the ADA and Rehabilitation Act, which expressly includes "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). A plaintiff requesting a reassignment accommodation must demonstrate that there existed a vacant position for which she was qualified "at or around the time when accommodation was sought." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 97-98 (2d Cir. 2009). Typically, a position is considered "vacant," for purposes of this reassignment-accommodation analysis, when a similarly situated, nondisabled employee would be able to apply for that position. Duvall v. Georgia-Pacific Consumer Prods. L.P., 607 F.3d 1255, 1263 (10th Cir. 2010). "[A]n employer need not reassign

10

an employee if no position is vacant. Nor is the employer obliged to create a new position to accommodate the employee." Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 99 (2d Cir. 1999) (citation omitted).

¶ 26. As a threshold matter, it is unclear whether reassignment to an existing, vacant position constitutes a reasonable accommodation under the FEPA. Although the definition of "reasonable accommodation" for the federal ADA and Rehabilitation Act expressly includes "reassignment to a vacant position," FEPA's definition of the term includes no similar language. Compare 42 U.S.C. § 12111(9)(B) with 21 V.S.A. § 495d(12)(B). We need not decide whether reassignment may be a reasonable accommodation under the FEPA because, even if it may, we conclude that there was no evidence of an existing, vacant, light-duty position at the time plaintiff sought one.

¶ 27. Plaintiff argues she established at least an inference that a light-duty position existed. First, plaintiff asserts that when her manager, Kevin Peets, denied her request for a position trimming rings, he mentioned only one reason: that she was seeking accommodation for a non-work-related injury. She contends a jury could reasonably infer that defendant actually had an existing, vacant position dedicated to trimming rings because if it did not, Mr. Peets would have said so. This inference by omission would be pure speculation. Plaintiff's argument ignores her affirmative duty, as the party with the burden of persuasion at trial, to put forth evidence from which a jury can reasonably infer the probable truth of her interpretation of events to the exclusion of other plausible explanations. See Boyd v. State, 2022 VT 12, ¶ 19, __ Vt. __, __ A.3d __ ("Where the moving party does not bear the burden of persuasion at trial, it may satisfy its burden of production by showing the court that there is an absence of evidence in the record to support the nonmoving party's case. The nonmoving party must then show that there are material facts in dispute. Evidence which merely makes it possible for the fact in issue to be as alleged, or which

11

raises a mere conjecture, surmise or suspicion is an insufficient foundation for a verdict." (quotations and citation omitted)).

¶ 28.    Second, plaintiff asserts that manager Peets testified at his deposition that the molding and finishing departments where plaintiff worked always had light-duty jobs available and that there were too many to count.  This mischaracterization conflates "jobs" with "tasks" and "assignments."  Manager Peets testified that "employees got light-duty work assignments during [his] tenure" and went on to list "putting labels on parts" and "trimming rings" as two examples of "tasks [that] an employee [would] be performing if they had light duty in the molding or finishing departments," but he stated he could not describe all examples of such tasks because they were "too numerous."  Manager Peets testified further that trimming rings and putting labels on parts are only one "very small piece of the entire job" of a finisher or molder.  Plaintiff contends that jobs trimming rings became vacant at the beginning and end of each shift, and thus a light-duty job was existing and vacant during May 2016 when she requested one.  This confusing formulation again conflates jobs with tasks.  Both plaintiff and manager Peets testified that trimming rings and similar light-duty assignments were merely one part of the numerous tasks—including both light duty and more physically demanding work—performed by employees in the molding and finishing departments.  There is no suggestion in manager Peets's testimony that such light-duty tasks existed as standalone full-time positions.  Plaintiff failed to establish a triable issue of fact regarding the existence of a vacant light-duty position around the time she returned to work in May 2016.

¶ 29.    In a similar vein, plaintiff contends defendant should have accommodated her by creating a new job composed solely of light-duty tasks because defendant had a policy or practice of creating light-duty jobs for injured employees.  She relies on a subset of reassignment-accommodation cases, chiefly Severson v. Heartland Woodcraft, Inc., 872 F.3d 476 (7th Cir. 2017). Severson recognized the settled principle that "an employer is not required to create a new

job or strip a current job of its principal duties to accommodate a disabled employee." Id. at 482 (quotation omitted).  But Severson also held that "if an employer has a policy of creating light-duty positions for employees who are occupationally injured, then that same benefit ordinarily must be extended to an employee with a disability who is not occupationally injured unless the company can show undue hardship."  Id.  If such a policy exists, these potential jobs must be considered in addition to any existing, vacant positions to determine whether reassignment may be a reasonable accommodation.  We need not decide whether this line of cases applies to the FEPA because we conclude that plaintiff failed to establish a reasonable inference that defendant had such a policy.

¶ 30.    Although plaintiff's arguments are not clear, she appears to assert that defendant's written policies, unwritten policies, or practices entitled her to a light-duty position.  Defendant's employee handbook stated that defendant "may provide, when available, transitional duty assignments for employees who are receiving workers compensation benefits and who are able to work, but not able to perform the essential duties of their position."  The policy clarified that "[t]ransitional duty assignments are not permanently assigned positions" and "[a]n employee may not be placed in a transitional duty assignment for more than a total of twelve (12) weeks for any work-related injury or illness unless otherwise approved."  The trial court found that this policy did not apply to plaintiff because she was not receiving workers' compensation at the time she sought reassignment in May 2016.  Plaintiff argues this finding was erroneous because there was a dispute of fact as to whether or not plaintiff was injured at work and thus entitled to workers' compensation benefits.

¶ 31.    We agree with the trial court.  Under the plain language of the policy, it covered only employees currently receiving workers' compensation benefits, not employees potentially eligible for them.  Plaintiff omits the fact that she had not yet applied for workers' compensation at the time she requested a light-duty accommodation.  Moreover, plaintiff submitted no evidence

13

regarding how defendant had applied this policy to others. Thus there was no reasonable basis for a jury to infer that defendant could or should have applied this policy to plaintiff. Regardless of where plaintiff was injured and whether she may have been eligible for workers' compensation, this policy did not satisfy plaintiff's burden, under federal case law, to demonstrate an existing, vacant position to which she could have been reassigned because the policy was discretionary and strictly temporary in nature. See Severson, 872 F.3d. at 483 (concluding that discretionary, infrequent, and temporary light-duty assignments did not constitute a policy of providing light-duty positions to injured employees and noting that "[i]f an employer bends over backwards to accommodate a disabled worker, it must not be punished for its generosity" (quotation and alterations omitted)).

¶ 32. Plaintiff argues that the affidavit of a co-employee, Mr. Suydam, independently created a dispute of fact whether defendant had light-duty positions available or an unwritten policy of creating such positions for injured employees. The affidavit plaintiff relies on is an amended version. The previous affidavit stated in relevant part:

> According to the paperwork, I have seen the same people trim rings for a year. Trimming rings is so much easier than running a press. One person I saw trim rings all the time, Terri Connor, on third shift, who has had major medical problems, did not seem to be able to do other jobs. I think Terri gave up being a quality auditor because she could not walk around a lot.

The amended affidavit clarified:

> I based my statement [quoted above], that I have seen the same people trim rings, in other words this would be their sole job, for a year straight, on what I have seen with my own eyes before and after [plaintiff] was terminated in May 2016.

¶ 33. Neither version of the affidavit provided context to support this statement, which was contradicted by essentially all the other summary-judgment exhibits for both parties, including other parts of Mr. Suydam's own affidavit. The "paperwork" that Mr. Suydam mentioned consisted of a handful of pages of sign-in and audit sheets, attached to his affidavit, that Mr.

14

Suydam claimed he found on a table near the "ring trimming station." Mr. Suydam explained that these pages list employee initials next to numbers of rings trimmed, but there were not more than a few consecutive dates shown for any particular initials. Accordingly, for the statement that employees solely trimmed rings for over a year to have created a triable issue of fact, it would have needed to be sufficiently clear and detailed such that a reasonable jury could have inferred from this sentence alone that defendant had a policy of creating permanent or long-term positions dedicated solely to trimming rings.

¶ 34. The affidavit was simply too vague. Mr. Suydam did not explain how many employees he witnessed trimming rings as their sole job. The use of the plural "people" suggested more than one, but the actual number was conjectural. Moreover, there was no basis to infer why these people were solely trimming rings, i.e., whether they were injured and being accommodated, they were working in pre-existing positions dedicated to trimming rings, or some other explanation. The prior version of the affidavit mentioned one person who trimmed rings "all the time" and had "major medical problems," but Mr. Suydam made no connection between this person's medical issues and any alleged policy of creating light-duty jobs for disabled employees.

¶ 35. Even if one could infer that defendant was accommodating these employees' disabilities, Mr. Suydam's statement provided no basis for determining whether the circumstances of accommodation were similar to plaintiff's circumstances such that plaintiff would naturally be covered by this pattern of accommodation—for example, whether these employees had definite recovery timelines or were permanently disabled. Because plaintiff provided no timeline for her recovery to defendant when she returned in May 2016, even under the generous framework of Severson she had to demonstrate that defendant had a policy of creating indefinite light-duty jobs for injured employees with uncertain recovery timelines or permanent disabilities. See Severson, 872 F.3d. at 479, 483 (holding that no applicable policy of creating light-duty jobs existed where plaintiff's recovery timeline was two months and evidence showed light-duty assignments

15

"generally lasted no longer than two days"); see also Dalton v. Subaru–Isuzu Auto., Inc., 141 F.3d 667, 680 (7th Cir. 1998) (holding automobile manufacturer not required to accommodate permanently disabled employees via assignment to program that consisted of light-duty positions set aside for temporarily disabled employees); accord Howell v. Michelin Tire Corp., 860 F. Supp. 1488, 1492 (M.D. Ala. 1994); King v. Town of Walkill, 302 F. Supp. 2d 279, 291 (S.D.N.Y. 2004); cf. Price v. City of New York, 264 F. App'x 66, 68-69 (2d Cir. 2008) (reversing summary judgment for police department where official policy required all full-time officers to be able to perform patrol duties but permanently disabled plaintiff identified six other permanently disabled officers whom police department allowed to remain employed, creating inference that patrolling was not essential function of position). Mr. Suydam's affidavit provided no support for such an inference. While plaintiff suggests that evidence of people solely trimming rings for over one year dovetails with her own recovery timeline of just over a year, this similarity is meaningful only in hindsight. The relevant time was May 2016, when plaintiff requested a light-duty position—not May 2017, a year after the alleged violation occurred and when she happened to fully recover. In May 2016, defendant had no way of knowing how long plaintiff would be disabled, and thus would have had to create a light-duty job of indefinite duration. There is no evidence that defendant ever created such a position, let alone that it had a policy of doing so. Thus, assuming for the sake of argument that reassignment pursuant to a policy of creating light-duty positions was a recognized accommodation under the FEPA, plaintiff failed to establish evidence of any such policy that may have applied to her.

¶ 36. Plaintiff additionally argues that the trial court misapplied the "sham affidavit" rule when it decided that Mr. Suydam's affidavit could not preclude summary judgment because it conflicted with plaintiff's previous deposition testimony. This contention is moot given our conclusion that Mr. Suydam's affidavit was insufficient at face value. We note, however, that the document was impotent for a different reason, which provides an alternative ground for affirming

16

the lack of any genuine dispute of material fact on this issue. See, e.g., <u>Ross v. Times Mirror, Inc.</u>, 164 Vt. 13, 19, 665 A.2d 580, 583 (1995) (affirming summary judgment on different grounds than trial court). The affidavit does not clearly demonstrate that the ring-trimming statement was based on Mr. Suydam's personal knowledge. See V.R.C.P. 56(c) ("An affidavit used to support or oppose a motion must be made on personal knowledge . . . ."). The latest affidavit clarified that Mr. Suydam knew employees solely trimmed rings for a year straight because he saw this "with [his] own eyes," whereas his previous affidavit based this statement on "the paperwork." Even taking these two versions of the affidavit together, Mr. Suydam did not explain how he could have known that other employees <u>solely</u> trimmed rings for a year straight. He asserted that he witnessed employees trimming rings when he trimmed them himself or inspected them. He cited to sign-in sheets attached to his affidavit where he initialed next to dates when he trimmed or inspected rings, but these comprised a mere handful of days. Mr. Suydam further stated that he walked by the ring-trimming table at least once per day. These scant opportunities for observation leave enormous gaps of time in his purported knowledge. Nowhere does Mr. Suydam explain how he could have personally witnessed employees trimming rings for entire consecutive shifts spanning one year—for instance, that he could see the ring-trimming table from his own station at all times. Mr. Suydam's conclusory statement, though sworn, was not apparently supported by personal knowledge, and thus could not have created a triable issue of fact. See <u>Vt. Dep't of Soc. Welfare v. Berlin Dev. Assocs.</u>, 138 Vt. 60, 62, 411 A.2d 1353, 1355 (1980) (per curiam) (holding affidavit insufficient to support motion for summary judgment because affidavit "read as a whole, does not reveal that the statements it contains were made on personal knowledge").

¶ 37.    Finally, plaintiff contends that the trial court erred in concluding that light duty was not a reasonable accommodation because it did not fulfill the essential functions of her previous job as a finisher. She cites to federal cases establishing that for purposes of considering a request for reassignment, courts should analyze the essential functions of the job plaintiff sought, rather

than plaintiff's current or last position. The trial court did ultimately consider plaintiff's qualification for a hypothetical light-duty position following plaintiff's motion for reconsideration, so this claim of error is misplaced. In any event, we need not decide how this distinction between the current job and the job sought bears on the FEPA because, as explained above, plaintiff failed to create a triable issue of fact as to the existence of a light-duty position or a policy of creating such positions. Because plaintiff could not perform the essential functions of her current job as a finisher and the new job she sought did not exist, she failed to establish that she was a "[q]ualified individual with a disability." See 21 V.S.A. § 495d(6) (defining "[q]ualified individual with a disability" as person "with a disability who is capable of performing the essential functions of the job . . . with reasonable accommodation to the disability"). Accordingly, defendant was entitled to summary judgment on plaintiff's FEPA discrimination claim for May 2016.

## II. Retaliation

¶ 38. Plaintiff challenges the trial court's dismissal of two allegations of retaliation. She alleged that defendant retaliated against her for taking four hours of PFLA leave on May 6, 2016 and filing a workers' compensation claim on May 12, 2016, by terminating her employment on May 20, 2016.

¶ 39. Under Vermont law, "[n]o person shall discharge or discriminate against an employee from employment because the employee asserted or attempted to assert a [workers' compensation] claim." 21 V.S.A. § 710(b). Where, as here, there is no direct evidence of unlawful retaliation, we apply the three-part burden-shifting framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Gauthier, 2015 VT 108, ¶ 15. To withstand summary judgment, plaintiff must first establish a prima facie case of retaliatory discrimination by showing "that (1) [s]he was engaged in a protected activity, (2) [her]employer was aware of that activity, (3) [s]he suffered an adverse employment decision, and (4) there was a causal connection between the protected activity and the adverse employment

18

decision." Id. ¶ 16 (quotation and alterations omitted). If plaintiff does so, the burden shifts to defendant to provide a "legitimate, nondiscriminatory reason for the challenged conduct." Id. ¶ 15. If defendant articulates such a reason, then defendant must show that the proffered reason was "a mere pretext for discrimination." Id. (quotation omitted).

¶ 40. Plaintiff's PFLA retaliation claim is based on a different statute. See 21 V.S.A. § 473 ("An employer shall not discharge or in any other manner retaliate against an employee who exercises or attempts to exercise his or her rights under [the PFLA]."). Both parties appear to assume, however, that claims under this statute are analyzed under the same framework as workers' compensation retaliation claims. The trial court also applied this framework. Although we have not had occasion to determine what legal framework applies to retaliation claims based on circumstantial evidence under 21 V.S.A. § 473, because the parties do not contest the trial court's use of the McDonnell Douglas test, we will assume without deciding that it applies here. See Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam) (applying McDonnell Douglas framework and holding that in order to make prima facie case in similar FMLA retaliation claim, plaintiff must establish that "(1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.").

The trial court concluded that plaintiff made out prima facie cases of PFLA retaliation and workers' compensation retaliation, but that defendant established a legitimate, nondiscriminatory reason for termination, and plaintiff did not raise a triable issue of fact as to pretext. On appeal, plaintiff makes six arguments regarding pretext, but they boil down to two: inconsistent application of defendant's workers' compensation policy and suspicious application of its leave-of-absence

19

policy. In framing these arguments plaintiff does not distinguish between her two allegations of retaliation, so we consider possible pretext as to either allegation.[3]

## A. Application of Workers' Compensation Policy

¶ 41. Plaintiff contends that if a jury believed she got injured at work as opposed to outside of work, then the "defense that she was not qualified for light duty under [defendant's] worker's compensation policy falls apart." She asserts there was a dispute of fact as to where she sustained her injury because two of her supervisors told the workers' compensation carrier that she was injured outside of work. She also claims that her supervisors had no basis for this belief, which further evidenced pretext.

¶ 42. Plaintiff's argument misrepresents the facts. Assuming that by "defense" plaintiff means defendant's proffered legitimate reason for terminating her employment, she points to no evidence that defendant ever stated that it fired her because her nonoccupational injury disqualified her from protection under its workers' compensation policy. As the trial court concluded, defendant met its burden of showing a legitimate, nondiscriminatory reason for terminating plaintiff when it stated in its statement of undisputed material facts attached to its summary judgment motion:

> As of May 11, 2016, plaintiff had exhausted all of her FMLA/VPFLA leave and she is unable to perform the essential function of her job according to her own physician's medical restrictions which provided no end date . . . . Mack Molding could not continue to employ[] plaintiff in a position she was not physically capable of performing.

The May 20, 2016 termination letter stated that "due to production schedules," it was "necessary to assign another employee to [plaintiff's] position." Plaintiff cannot put words in defendant's mouth only to claim that they sound suspicious.

---

[3] Plaintiff states that the same pretext arguments also apply to her allegations of FEPA discrimination. Given our conclusion that plaintiff failed to establish a prima facie case under FEPA, we need not consider possible pretext as to that claim.

¶ 43. Even if plaintiff's argument were based on an accurate portrayal of facts, it would fail. The trial court construed plaintiff's contention to be that defendant's denial of her request for light duty deviated from defendant's ordinary policy or practice, and that this deviation evidences pretext. See Mellin v. Flood Brook Union Sch. Dist., 173 Vt. 202, 212, 790 A.2d 408, 418 (2001) (noting that employer's response to employment situation that differs from response under employer's ordinary policy may be evidence of pretext in retaliation cases). On appeal plaintiff does not seek to correct this interpretation, so we consider her argument as framed by the trial court. The court rejected her contention, finding that defendant's policy of assigning light duty to occupationally injured employees was discretionary, subject to availability of work, and applied only to employees who were currently receiving workers' compensation benefits. Because it was undisputed that plaintiff was not receiving workers' compensation benefits, the court reasoned, rejecting plaintiff's request did not demonstrate a deviation from this policy, let alone a deviation evidencing pretext. We agree and note further that plaintiff failed to present any evidence of how defendant applied this policy to other similarly situated employees. There was no basis for a jury to infer that defendant even occasionally applied the light-duty-assignment provision of its workers' compensation policy to employees who, like plaintiff, had not applied for or received workers' compensation benefits. No reasonable jury could find that defendant's refusal to assign plaintiff to light duty on May 6, 2016 was evidence of defendant retaliating against her for taking four hours of medical leave later on May 6, 2016 or applying for workers' compensation on May 12, 2016.

¶ 44. Plaintiff relatedly contends that her supervisors told the workers' compensation carrier, without evidence or investigation, that she was injured outside of work, suggesting defendant's stated reasons for terminating her were pretextual. This assertion again distorts the record. Given the undisputed facts that plaintiff originally injured her knee outside of work in 2015, and then returned to work and left again multiple times over the next year due to knee pain,

21

there was at least some basis for plaintiff's supervisors to believe that her absences related to this initial nonoccupational injury. But we need not consider the argument further. Although plaintiff claims the trial court never addressed this contention, she does not indicate whether and how it was preserved, and we will not address it for the first time on appeal. See V.R.A.P. 28(a)(4)(A) (establishing appellant's duty to explain how arguments were preserved); In re White, 172 Vt. 335, 343, 779 A.2d 1264, 1270 (2001) ("We have repeatedly stressed that we will not address arguments not properly preserved for appeal.").

¶ 45.   Plaintiff additionally argues that defendant assigned her to light duty between October and November 2015 but refused to assign her to light duty in May 2016, suggesting that the workers' compensation policy is applied "when convenient." She once again relies on an unsupported factual premise. When plaintiff returned to work in October 2015, she had no medical restrictions other than a time limit of four hours per day. At that time defendant placed her in an existing, established position: finisher. The fact that the finisher position may have been less physically intensive than plaintiff's previous role as molder does not mean that defendant was applying its workers' compensation policy to accommodate her. Under its workers' compensation policy, defendant could assign temporarily injured employees to "[t]ransitional duty assignments" for up to twelve weeks, in its discretion and subject to availability of such work. The policy stated that these assignments were "not permanently assigned positions." There was no clear suggestion by either party below that defendant was applying its workers' compensation policy to plaintiff when it switched her from molder to finisher in October 2015. To the contrary, the evidence demonstrated that the finisher position was permanent, as plaintiff ramped up to full-time hours in November 2015 and remained working as a finisher until her injury in May 2016—far beyond the twelve-week maximum of temporary assignments under the workers' compensation policy. Placing plaintiff in a less physically intensive, but permanent and pre-existing, position was not

22

evidence of defendant selectively applying its policy regarding transitional light-duty assignments.[4]

¶ 46.  Finally, plaintiff asserts a jury could find pretext in the fact that defendant's termination letter was dated May 20, 2016, and the letter stated that defendant's job was not protected because she was not currently on workers' compensation benefits, yet defendant did not mail this letter until May 24, 2016, the same day the workers' compensation carrier denied her claim.  Plaintiff argues, quoting Loudermilk v. Best Pallet Co., 636 F.3d 312 (7th Cir. 2011), that "[t]he closer two events are, the more likely that the first caused the second."  Id. at 314-15.  But plaintiff does not develop this argument at all, and never asserts what event she thinks caused what other event.  It was undisputed that plaintiff was not receiving workers' compensation benefits at any time during May 2016, so the termination letter was accurate whether it was actually written before or after the carrier denied her claim.  To the extent plaintiff suggests any improper collusion between defendant and its carrier, she cites nothing in the record to support this notion, nor any legal authority to explain how it might evidence pretext.  We see no reasonable connection between the date that defendant mailed this termination letter and plaintiff's allegations that defendant was motivated to terminate her either because she took medical leave or applied for workers' compensation.

B.  Application of Leave-of-Absence Policy

¶ 47.  Plaintiff asserts that defendant's decision to fire her as a 19.5-year employee, who would have accrued 11.9 weeks of medical leave just days later, was evidence of pretext.  Given these circumstances, she suggests that it was suspiciously harsh for defendant not to have placed her on a leave of absence until her medical leave reloaded because defendant's discretionary leave-

---

[4] In connection with this argument plaintiff also alleges that defendant violated its "policy of immediately completing incident reports about any work injuries."  But she fails to cite any evidence of such a policy.  And her own arguments imply that she understood it was her duty to complete an incident report, not defendant's duty to fill out a report on her behalf.

of-absence program "allowed employees to request up to 60 days and seek an extension." The trial court rejected this argument because plaintiff failed to show that defendant had any obligation to keep her on a non-PFLA leave for any period of time. Plaintiff contends that "the fact that an employee benefit is discretionary does not mean that how it is applied cannot be evidence of pretext."[5]

¶ 48. We are unpersuaded by these arguments. As a threshold matter, there is no indication that plaintiff ever requested to be on a leave of absence or extend any leave of absence that defendant afforded her. Thus, under her own characterization of the policy—that employees could "request up to 60 days and seek an extension"—she failed to invoke the policy at all. Moreover, as with the workers' compensation policy, plaintiff points to no evidence of how defendant applied this discretionary leave-of-absence program to others. Nor does she identify any standards in the policy for exercising discretion in considering requests for a leave of absence. A factfinder would need to speculate that defendant typically afforded employees similarly situated to plaintiff with sufficient unpaid leave to bridge a gap between injury and accrual of medical leave. Without any evidence of how defendant actually applied its discretionary leave-of-absence program, there is no basis for a factfinder to infer discriminatory intent from the mere existence of such a policy.

¶ 49. Even apart from these infirmities, the broader context of the parties' actions and the succession of events undercuts any inference of improper motive. Plaintiff left work on May 5, 2016 due to knee pain and returned the next day with a doctor's note containing medical

---

[5] Although plaintiff alludes to some impropriety in the fact that defendant terminated her shortly before she would have been eligible for 11.9 additional weeks of PFLA leave, she never develops this into a standalone claim or argument. Indeed, she cites no legal authority for the proposition that a retaliation claim may be based on a conditional future accrual of benefits and anticipated exercise of those benefits. Or that proximity between termination and anticipated exercise of yet unaccrued benefits may be evidence of pretext supporting a retaliation claim based on a prior protected action. We therefore need not consider whether such arguments may be viable under Vermont law.

restrictions that undisputedly precluded her from performing the essential functions of a molder or finisher.  She asked her supervisor to be assigned solely to trim rings.  Her supervisor declined and stated that "[w]e don't have anything for you."  Plaintiff then punched out and went home.  Although plaintiff did not specifically request to take medical leave on May 6, 2016, she also never sought to apply any other type of leave.  Defendant allotted the only PFLA leave time that plaintiff currently had—four hours' worth—to May 6, 2016.  On May 11, 2016, when plaintiff still had not returned to work, defendant sent her a letter indicating that she had exhausted her medical leave.  The letter also noted that she had yet to apply for short-term disability or workers' compensation benefits, despite being invited to do so on May 9, 2016.  The letter stated that defendant would consider her absence a voluntary resignation if she did not respond by May 16, 2016.  On May 12, 2016 plaintiff completed an incident report to apply for workers' compensation, asserting she was injured at work in August 2015 when she first returned from her medical leave and was operating the Press 30 machine.  More than a week later, defendant sent plaintiff a final letter stating that her application for workers' compensation would be reviewed by its insurance company, but that "[d]ue to production schedules it has become necessary to assign another employee to your position at Mack Molding Company and therefore, your employment has been terminated effective Friday, May 20, 2016."

¶ 50.    This sequence demonstrates that plaintiff did not proactively seek benefits; instead, defendant took initiative to remind her of her rights.  Defendant applied her remaining medical leave to the first day following her injury, when she did not work and did not specify any other basis for taking time off.  Likewise, defendant invited plaintiff multiple times to apply for workers' compensation benefits before she finally did so.  Although defendant had previously accommodated plaintiff for her knee injury, given plaintiff's new medical restrictions in May 2016 there was no way to keep her working in an existing position within the molding or finishing departments.  Defendant was faced with the decision whether to retain an employee who was

25

injured indefinitely and could not perform the essential functions of her job. Under these circumstances, mere temporal proximity between the date to which defendant allocated plaintiff's remaining PFLA leave and the date of termination does not suggest pretext. Similarly, the fact that plaintiff finally applied for workers' compensation benefits on May 12 after defendant twice solicited her to do so, does not on its own suggest that plaintiff's termination eight days later was in retaliation for this application.

¶ 51. Plaintiff cites four cases to support the argument that defendant's application of its leave-of-absence policy was suspiciously harsh. All are unavailing. She relies on a single quote taken out of context from a Southern District of New York decision: "A reasonable jury could also conclude that termination of a 25-year career was unreasonably and inexplicably harsh." Miles v. N. Gen. Hosp., 998 F. Supp. 377, 386 (S.D.N.Y. 1998). The word "also" is telling. Miles found a triable issue of fact as to age discrimination based on a myriad of contributing circumstances not present here:

> discriminatory remarks; the affidavits of the three former employees; [a supervisor's] purported harsh treatment of plaintiff; [a supervisor's] effort to pad plaintiff's file with negative references to her performance; and the Hospital's seemingly severe decision to fire, rather than demote or discipline in some other less severe fashion, a 55–year old employee with 25 years of service who was receiving satisfactory or better ratings in most categories on her evaluations, when other [employees] who were also remiss in submitting reports on time were not fired.

Id. at 388. The termination appeared particularly harsh because, unlike plaintiff here, the twenty-five-year employee was still capable of performing her job and was fired merely for submitting some late reports. Id. at 386-88. Plaintiff here presented no comparators or circumstantial evidence to support that her termination was "unreasonably and inexplicably harsh," let alone other corroborating evidence of improper motive as existed in Miles. Id. at 386.

¶ 52. Davis v. New York City Department of Education, 804 F.3d 231 (2d Cir. 2015), involved a different legal question altogether—whether the denial of a discretionary benefit could

be an adverse employment action. Id. at 236. Although the Second Circuit answered this question affirmatively, it affirmed summary judgment in favor of the employer because the plaintiff had failed to present sufficient evidence that would support a finding of discriminatory motivation. Id. This case does not help plaintiff establish pretext.

¶ 53. Plaintiff cites two federal district court cases that addressed claims of retaliation for taking protected leave, but each denied summary judgment for the employer based on considerably stronger evidence of pretext than plaintiff has presented here. In Reyer v. Saint Francis Country House, 243 F. Supp. 3d 573 (E.D. Pa. 2017), the employer claimed it had fired the plaintiff because he was indefinitely injured and could not perform his job, his FMLA leave had expired, and it needed to fill his position quickly. Id. at 589. The district court found that the plaintiff "barely" established a triable issue of fact as to pretext based on evidence that he had been fired on the same day his FMLA leave expired; that his employer failed to even consider whether the plaintiff was entitled to the protections of its discretionary leave-of-absence policy; that despite repeated email, phone, and in-person inquires, the employer failed to provide the plaintiff with information about how much of his FMLA leave remained until shortly after his termination; that multiple supervisors presented inconsistent testimony regarding who discussed and ultimately decided to terminate the plaintiff; that there was a dispute of fact as to the "essential functions" of the plaintiff's job and whether he could perform those functions at the time he was terminated; and that the employer delayed hiring the plaintiff's replacement until two months after he submitted his employment application. Id. at 588-91. None of these facts were present here. Rather than asking for clarification and being met with silence or obfuscation, plaintiff made no inquiries regarding her medical leave or any possible leave of absence in May 2016, and defendant nevertheless promptly informed plaintiff of her expired leave and invited her to apply for other benefits to which she might be entitled. That defendant was not more generous by giving plaintiff

an unsolicited leave of absence under a discretionary policy cannot demonstrate discriminatory intent without some evidence of how defendant applied its leave-of-absence policy to others.

¶ 54. Plaintiff quotes Garrett v. Atlanticare Health System, Inc., No. 07-5416-NLH-AMD, 2009 WL 3446755 (D.N.J. Oct. 21, 2009) for the proposition that "[i]f [the Unprotected Leave Policy] was implemented in a way intended to retaliate against Plaintiff for her invocation of FMLA leave, such conduct is not immunized simply because Defendant could have terminated her [earlier]." Id. at *8. Unlike here, however, the Garrett plaintiff proffered evidence that her employer applied its leave policy less favorably to her than to her replacement under the same circumstances. Id. at *6, *8. The district court denied summary judgment for the employer based on several indications of possible pretext, including this evidence of selective enforcement of a formal policy. Id. at *8. Plaintiff here adduced no evidence whatsoever of how defendant applied its leave-of-absence policy to others.

¶ 55. Ultimately, plaintiff had the burden to present some admissible material by which a reasonable jury could infer that defendant's stated legitimate, nondiscriminatory reason for terminating her—that she was indefinitely incapable of performing the essential functions of her job—was a lie. Gauthier, 2015 VT 108, ¶ 22. She failed to do so. The trial court correctly granted summary judgment to defendant on plaintiff's retaliation claims.

Affirmed.

FOR THE COURT:

_____
Associate Justice

28